UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARVIN HARRISON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10-cv-4674 |
| | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS DEPARTMENT OF TRANSPORTATION, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Plaintiff Marvin Harrison has brought a nine-count complaint alleging racial discrimination by his employer, the Illinois Department of Transportation ("IDOT"), and several individuals within IDOT, specifically, Gary Hannig, William Grunloh, Carmen Iacullo, Giovanni Fulgenzi, Steve Travia, Charles Klemz, and Marie Malek-Robinson (collectively "Defendants"). (Compl. ¶¶ 7–18.) Defendants have filed a motion to dismiss the complaint. Their motion is granted in part and denied in part.

**I. BACKGROUND**

We begin by briefly recounting the allegations in Plaintiff's complaint. Plaintiff has been employed by IDOT in various positions since 1995. (*Id.* ¶ 19.) Most significantly, Plaintiff served as the Lead/Lead Worker in IDOT's Emergency Traffic Patrol ("ETP") division. (*Id.* ¶ 20.) In this position, Plaintiff oversaw dozens of IDOT employees charged with responding to accidents and incidents on Illinois highways. (*Id.* ¶ 34.) Plaintiff claims to be the first and to-date only African American to have held this position in over thirty years. (*Id.* ¶ 20.) Plaintiff

obtained this position pursuant to the settlement of a prior employment discrimination claim he brought. (*Id.*, Ex. A.) *See Harrison v. Feliciano*, No. 05-C-1944, Dkt. No. 77 at 1–2 (N.D. Ill. June 21, 2007). Plaintiff's involuntary transfer away from this position in the spring of 2010 is the basis for this lawsuit. (Compl. ¶¶ 30–42.)

In August 2009, a few months before his transfer, Plaintiff alleges that one of his subordinates at ETP, a white employee named Ralph Eme, repeatedly used a racial slur to disparage Plaintiff in the presence of some supervisors at ETP. (*Id.* ¶ 23.) Plaintiff was distressed to learn of Eme's use of the slur—which Plaintiff describes as "the 'n' word"— as well as of the supervisors' failure to report Eme's actions to upper management or to IDOT's Bureau of Civil Rights. (*Id.*) Ultimately, Plaintiff reported Eme's actions himself and requested an investigation. (*Id.*, Ex. C.)

Although Plaintiff acknowledges that an investigation resulted, he contends that it was both faulty and inadequate. (*Id.* ¶ 24.) In particular, Plaintiff alleges that a member of IDOT's personnel department, Defendant Giovanni Fulgenzi, oversaw the investigation, even though the investigation should have fallen within the purview of IDOT's Bureau of Civil Rights. (*Id.*) Plaintiff also complains that the investigation did not yield any disciplinary action against Eme or the supervisors who overheard Eme's statements. (*Id.*)

Plaintiff also alleges that his reporting of the incident involving Eme had the perverse result of triggering an investigation in to Plaintiff's management of his subordinates. (*Id.* ¶ 26.) Beginning in January 2010, a few months after Plaintiff reported the incident, Defendant Marie Malek-Robinson of IDOT's personnel department began an investigation in to "personnel issues" at ETP. (*Id.* ¶ 25.) During this investigation, some of Plaintiff's subordinates began

"circulating a 'petition' calling for [Plaintiff's] removal" and others began "'gathering information' about him." (*Id.* ¶ 27.) "Thus," in Plaintiff's view, "rather than responding to a complaint of a civil rights violations by investigating the employee(s) who were alleged to have engaged in misconduct, IDOT instead instigated an investigation into whether Plaintiff's subordinates were content to work under his authority." (*Id.* ¶ 26.) On February 5, 2010, Plaintiff filed an internal complaint against Defendant Malek-Robinson because of her investigation, but the complaint was not investigated. (*Id.* ¶ 27.)

In early March 2010, Plaintiff received a call from Elbert Simon, the head of IDOT's Bureau of Civil Rights, and Ellen Schanzle-Haskins, IDOT's chief legal counsel. (*Id.* ¶ 29.) Simon and Schanzle-Haskins called Plaintiff to ask him whether he would be willing to transfer from ETP to a position managing an IDOT maintenance yard. (*Id.*) Plaintiff declined the proposed transfer. In Plaintiff's view, the maintenance yard position had "greatly diminished responsibilities" compared to his position at ETP. (*Id.*)

Despite Plaintiff's objection, Defendant William Grunloh, IDOT's chief of staff, called Plaintiff on March 22, 2010 to tell him that he was being transferred to the position in the maintenance yard. (*Id.* ¶ 30.) According to Plaintiff, Defendant Grunloh told him that the transfer would be "temporary and based on operational needs." (*Id.*) But Plaintiff maintains that Defendant Grunloh's invocation of "operational needs" was pretextual, because IDOT began interviewing candidates for Plaintiff's old position at ETP the week after the transfer. (*Id.* ¶ 33.) Plaintiff further alleges that IDOT promoted Mark Jercha, a white male, in to Plaintiff's old position at ETP on May 28, 2010. (*Id.*)

Even though he has retained his Lead/Lead Worker title in his new position, Plaintiff views his transfer to the maintenance yard as a demotion. (*Id.* ¶ 34.) As Plaintiff puts it: "Rather than supervising nine lead workers and dozens of drivers who act as first responders to accidents and incidents on the state's highways, Plaintiff now supervises a [sic] 4 to 8 workers and one Lead Worker doing menial tasks such as picking up litter and cutting grass[.]" (*Id.*) The maintenance yard job also has substantially fewer opportunities for Plaintiff to work overtime, and as a result, Plaintiff states that he "has lost and continues to lose thousands of dollars each month in overtime wages." (*Id.* ¶ 35.) Furthermore, Plaintiff must now also commute over forty-five minutes to work, apparently in violation of Plaintiff's union contract. (*Id.* ¶ 34.)

Dissatisfied with his new job, Plaintiff has continued to inquire in to why he was transferred and has repeatedly asked to return to ETP from what had been billed to him as a "temporary" posting to the maintenance yard. (*Id.* ¶ 37.) Plaintiff contends that, in response to his insistent inquiries, IDOT "completely backtracked from the pretextual 'operational needs' explanation" for the transfer. (*Id.*) Instead, IDOT began claiming that the transfer had taken place because "a threat had been made on [Plaintiff's] life" on the social networking website Facebook. (*Id.*) Plaintiff also learned that IDOT had reported the threat to the Federal Bureau of Investigation ("FBI") as a "possible hate crime." (*Id.*) When Plaintiff spoke to the FBI investigator handling the case, as he had been instructed to do by IDOT personnel, Plaintiff learned that the alleged threat consisted of "a white subordinate ETP employee" posting something to the effect of "Let's get rid of Marvin Harrison." (*Id.* ¶ 38.) Nevertheless, Plaintiff says that the "FBI did not treat the threat as a real danger to Plaintiff's life and dismissed it altogether a week after Plaintiff was moved from ETP." (*Id.* ¶ 39.)

As he pressed to get his old job back during April and May of 2010, Plaintiff contends that IDOT representatives continued to offer varying explanations as to why he was transferred. Although IDOT's chief counsel apparently told Plaintiff in an email on May 20, 2010 that "we transferred you . . . for your safety due to threats on your life that are part of an FBI hate crimes investigation," other IDOT personnel told Plaintiff during a union grievance hearing that he had been transferred due to "operational needs." (*Id.* ¶ 40.) According to Plaintiff, these inconsistent explanations demonstrate that "IDOT removed Plaintiff from his Lead/Lead Worker position in response to race-based threats directed against him by one or more white subordinate employees." (*Id.* ¶ 41.) Furthermore, Plaintiff contends that "IDOT acquiesced to the demands of white subordinate employees for Plaintiff's removal." (*Id.*)

After filing a charge with the Equal Employment Opportunity Commission ("EEOC"), Plaintiff subsequently filed this lawsuit on July 27, 2010. Plaintiff's nine-count complaint alleges various Title VII, § 1981, § 1983, and state law claims. (*Id.* ¶¶ 43–90.) In lieu of answering the complaint, Defendants filed a motion to dismiss the complaint on several grounds. (Mot. & Mem.) Plaintiff responded to Defendants' motion to dismiss by agreeing to withdraw several of his claims. (Resp. at 7–9.) Specifically, Plaintiff agreed to withdraw Counts II, VII, VIII, and IX in their entirety. (*Id.* at 9.) Plaintiff has also agreed to withdraw his § 1981 claim against Defendant IDOT alleged in Count III, as well as his § 1981 and § 1983 claims against all Defendants in their official capacities. (*Id.*) We dismiss these claims accordingly.

Thus, what remains of Plaintiff's complaint is as follows: Count I alleging race discrimination in violation of Title VII against Defendant IDOT; Count III alleging retaliation in violation of Title VII against Defendant IDOT; Count IV alleging race discrimination in

violation of § 1981 against the individual Defendants; Count V alleging retaliation in violation of § 1981 and Title VII against the individual Defendants; and Count VI alleging race discrimination in violation of § 1983 against the individual Defendants. (Compl. ¶¶ 43–74.)

## II. ANALYSIS

In the wake of Plaintiff's withdrawal of several of his claims, only two grounds remain for Defendants' motion to dismiss. First, Defendants argue that all of Plaintiff's remaining claims should be dismissed because of allegedly false statements Plaintiff made in his application to proceed *in forma pauperis* in this case. Second, Defendants argue that Plaintiff has failed to adequately allege personal involvement in the decision to transfer Plaintiff that is the basis for his § 1981 and § 1983 claims in Counts IV, V, and VI. We consider each argument in turn.

### A. Plaintiff's *In Forma Pauperis* Application

Defendants ask us to dismiss all of Plaintiff's remaining claims because of Plaintiff's allegedly false statements in his application to proceed *in forma pauperis* ("application"). (Mem. at 4–6.) Specifically, Defendants contend that Plaintiff misrepresented his monthly income on his application, when, in the space provided for stating his "*Monthly* salary or wages," Plaintiff stated his salary to be "$2,000." (Mem., Ex. A. at 1 (emphasis original).) Defendants have submitted an affidavit from the payroll manager at IDOT averring that Plaintiff's salary at the time he completed his application was approximately $5,800 per month. (Taylor Aff. ¶ 4.) Accordingly, Defendants cite a portion of the statute governing *in forma pauperis* status that states that "the court *shall* dismiss the case at any time if the court determines that . . . the

-6-

allegation of poverty is untrue[.]" (Mem. at 5 (citing 28 U.S.C. § 1915(e)(2)(A) (emphasis added).) Defendants also contend that dismissal is appropriate even though we denied Plaintiff's application. (Mem. at 5–6; Ord. 8/2/10 at 1 (denying Plaintiff's application).)

We disagree. The Seventh Circuit has declined to apply the mandatory dismissal language of 28 U.S.C. § 1915(e)(2)(A) to situations where a party has not "reap[ed] the benefits of *in forma pauperis* status[.]" *Hrobowski v. Commonwealth Edison Co.*, 203 F.3d 445, 447–48 (7th Cir. 2000); *see also Kim v. Earthgrains Co.*, No. 01-cv-3895, 2010 WL 2610460, at *3 (N.D. Ill. June 24, 2010); *Davis v. Green*, No. 1:06-cv-1469, 2009 WL 362877, at *4 (S.D. Ind. Feb. 11, 2009). In *Hrobowski*, the Seventh Circuit reversed the district court's decision to invoke 28 U.S.C. § 1915(e)(2)(A) to dismiss the plaintiff's claims, because, prior to the dismissal, the district court had denied the plaintiff's second *in forma pauperis* application. 203 F.3d at 447–48. The Seventh Circuit reached this decision even though the plaintiff had proceeded *in forma pauperis* for some of the litigation and even after "a withering cross-examination that revealed the various omissions on his *in forma pauperis* applications." *Id.* at 447. Despite all this, the Court observed that "once the district court denied Hrobowski's second *in forma pauperis* application . . . he began to proceed . . . like any other plaintiff." *Id.* at 448. Thus, it "[did] not make sense" to dismiss his case based on "a section of the U.S. Code entitled 'Proceedings in forma pauperis[.]'" *Id.*

In this case, Plaintiff has not "reap[ed] the benefits of *in forma pauperis* status" because we denied his application. (Dkt. No. 6.) And after the denial, Plaintiff has proceeded "like any other plaintiff" by paying his filing fee and hiring an attorney. (Dkt. Nos. 8 & 30.) Thus, in

light of *Hrobowski*, dismissal of Plaintiff's claims pursuant to 28 U.S.C. § 1915(e)(2)(A) is inappropriate.[1]

### B. Personal Involvement by the Individual Defendants

Defendants alternatively contend that Plaintiff's complaint is deficient in failing to allege personal involvement by several of the individual Defendants in the discrimination and retaliation alleged in Counts IV, V, and VI. (Mem. at 10–12.) Although Defendants concede that Plaintiff has stated claims against Defendant Grunloh, they move for dismissal of the remaining individual Defendants on these counts pursuant to Rule 12(b)(6).

A motion to dismiss under Rule 12(b)(6) is meant to test the sufficiency of the complaint, not to decide the merits of the case. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir.1990). A court may grant a motion to dismiss under Rule 12(b)(6) only if a complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007); *see Ashcroft v. Iqbal*, --- U.S. ----, ---- - ----, 129 S.Ct. 1937, 1949–50 (2009) (extending *Twombly* from antitrust to litigation generally and stating that a court's determination "whether a complaint states a plausible claim for relief will . . . be a context-specific task"); *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618–19 (7th Cir. 2007); *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776–77 (7th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

[1] Defendants argue that courts have dismissed cases with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(A) "even when the [*in forma pauperis* application] did not result in the grant of *in forma pauperis* status." (Resp. at 5.) But the authority upon which Defendants rely for this proposition is an unpublished Seventh Circuit order. (*Id.* (citing *McRoyal v. Commonwealth Edison Co.*, No. 07-2402, 2008 WL 345345, at *2 (7th Cir. Feb. 8, 2008)).) Such unpublished orders are not binding precedent. Accordingly, we follow *Hrobowski*, which is the "law of the circuit." 7th Cir. R. 32.1(b).

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949.

Although a facially plausible complaint need not give "detailed factual allegations," it must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964–65. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S.Ct. at 1949. These requirements ensure that the defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964; *see also* Fed. R. Civ. P. 8(a). In evaluating a motion to dismiss, we must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Iqbal*, 129 S.Ct. at 1949–50; *Thompson v. Ill. Dep't. of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002).

Pursuant to § 1981 and § 1983, Plaintiff brings three separate claims against the seven individual Defendants.[2] Counts IV and VI allege racial discrimination in violation of § 1981 and

---

[2] Plaintiff purports to bring Counts IV and V pursuant to § 1981 and Count VI pursuant to § 1983. But because the individual Defendants are state actors, Plaintiff should have brought all these claims pursuant to § 1983. It is true that § 1981, as amended by the Civil Rights Act of 1991, can serve as the source of substantive rights for bringing an action against a state actor who violates those rights. 42 U.S.C. § 1981©; Pub. L. No. 102-166, Tit. I, § 101, 105 Stat. 1071, 1072 (1991). But prior to the 1991 amendment of § 1981, the Supreme Court held in *Jett v. Dallas Independent School District* that § 1981 does not create an independent cause of action against state actors. 491 U.S. 701, 731, 109 S.Ct. 2702, 2721 (1989). Only § 1983 provides such a cause of action. *Id.* Furthermore, even in the wake of the 1991 amendment to § 1981, most courts that have examined the issue have determined that the amendment, although expanding § 1981 to include discriminatory actions by state actors, did not create a new cause of action. *See Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995); *Felton v. Polles*, 315 F.3d 470, 481–82 (5th Cir. 2002); *Artis v. Francis Howell North Band Boosters Assn.*, 161 F.3d 1178, 1181 (8th Cir. 1998); *Butts v. Cnty. of Volusia*, 222 F.3d 891, 892 (11th Cir. 2000); *but see Federation of African American Contractors v. City of Oakland*, 96 F.3d 1204, 1214 (9th Cir. 1996). Thus, a violation of the rights guaranteed in § 1981 by a state actor is properly brought as a so-called "and laws" § 1983 claim. *See* 42 U.S.C. § 1983 (providing for "an action at law" against "[e]very person" who "under color of" state law deprives any person within the jurisdiction of the United States "of any rights, privileges, or immunities secured by the Constitution *and laws*") (emphasis added). Counts IV and V should have been pled as § 1983 actions for which the substantive rights violated stem from § 1981. That is how we construe the complaint, and that is how Plaintiff should plead any amended complaint he files in the wake of this opinion.

the Fourteenth Amendment. (Compl. ¶¶ 62, 73.) Section 1981 prohibits intentional racial discrimination in the "mak[ing] and enforce[ment] [of] contracts[,]" including employment contracts. 42 U.S.C. § 1981(a). The Equal Protection Clause of the Fourteenth Amendment prohibits intentional racial discrimination by state officials. U.S. Const., amend. XIV, § 1; *Washington v. Davis*, 426 U.S. 229, 247–48, 96 S.Ct. 2040, 2051 (1976); *Minority Police Officers Ass'n of South Bend v. City of South Bend, Ind.*, 801 F.2d 964, 966 (7th Cir. 1986). In order to sustain an employment discrimination claim against a state official, a state or local employee must establish that he or she: "(1) is a member of a protected class; (2) is otherwise similarly situated to members of the unprotected class; (3) suffered an adverse employment action; (4) was treated differently from members of the unprotected class; and (5) the defendant acted with discriminatory intent." *McPhaul v. Bd. of Com'rs of Madison Cnty.*, 226 F.3d 558, 564 (7th Cir. 2000). Regarding discriminatory intent, the Seventh Circuit has stated that this standard "implies more than intent as volition or intent as awareness of consequences." *Nabozny v. Podlesny*, 92 F.3d 446, 454 (7th Cir. 1996) (cited in *McPhaul*, 226 F.3d at 564.) The "decisionmaker" must act "either intentionally or with deliberate indifference" in an effort to "single[] out a particular group for disparate treatment[.]" *Id.*

Count V alleges retaliation in violation of § 1981 and Title VII. (Compl. ¶ 67.) Because the individual Defendants are not "employers" within the meaning of Title VII, Plaintiff's Title VII retaliation claim against them in Count V is improper. 42 U.S.C. § 2000e (b); *Williams v. Banning*, 72 F.3d 552, 554 (7th Cir. 1995). We thus construe Count V as alleging only a § 1981 retaliation claim against the individual Defendants. A plaintiff may establish a claim for retaliation under § 1981 through either a direct or indirect method of proof. While he need not

pick which method to use at the pleading stage, we construe Plaintiff's complaint as proceeding under the direct method, which requires Plaintiff to establish: (1) that he engaged in a statutorily protected activity, (2) that he suffered an adverse employment action, and (3) that there is a causal connection between the protected activity and the adverse action.[3] *Stephens v.Erickson*, 569 F.3d 779, 786–87 (7th Cir. 2009).

With the exception of Defendant Grunloh, the individual Defendants move to dismiss all three claims based on lack of personal involvement in the alleged discrimination and retaliation. (Mem. at 10–12.) Liability under § 1981 and § 1983 depends upon individual fault. *Daigre v. City of Harvey*, No. 04-cv-4224, 2009 WL 2371727, at *2 (N.D. Ill. Jul. 30, 2009); *Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998). To be liable for racial discrimination under § 1981 and § 1983, an individual defendant must have personally "caused or participated in" the allegedly discriminatory action. *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1039 (7th Cir. 2003). Additionally, because § 1981 and § 1983 racial discrimination claims only provide remedies for intentional discrimination, "the plaintiff must sufficiently allege that the defendant himself [or herself] possessed an 'intent to discriminate on the basis of race.'" *Behnia v. Shapiro*, 961 F. Supp. 1234, 1237 (N.D. Ill. 1997) (citation omitted); *see also Black v. Safer Foundation*, No. 02-C-2751, 2003 WL 21823483, at *8 (N.D. Ill. Aug. 6, 2003); *McPhaul*, 226 F.3d at 564.

In this case, the "adverse employment action" of which Plaintiff complains is his transfer from ETP to the maintenance yard. *McPhaul*, 226 F.3d at 564; *Stephens*, 569 F.3d at 786–87.

---

[3] We make this presumption because Count V contains no allegations as to whether Plaintiff was meeting his employer's legitimate expectations and whether he was treated less favorably than employee who did not engage in the protected activity, both of which are required elements under the indirect method of proof. *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008).

(Compl. ¶¶ 65(A), 69(A), 74(A).) Plaintiff claims that the transfer was racially motivated. (*Id.* ¶¶ 62, 73.) Plaintiff also claims that the transfer was in retaliation for Plaintiff's "filing [of] a complaint with the Bureau of Civil Rights about racial slurs directed against him as well as filing against [Defendant] Malek-Robinson[.]" (*Id.* ¶ 67.)

The trouble with Plaintiff's § 1981 and § 1983 claims is that his complaint lumps each of the individual Defendants together without regard to their respective roles, if any, in the decision to transfer Plaintiff from ETP. This method of pleading contravenes the rule that liability under § 1981 and § 1983 is premised upon individualized fault. *Daigre*, 2009 WL 2371727 at *2; *Jenkins*, 147 F.3d at 583. For instance, Plaintiff alleges that: "[o]n information and belief, Defendants Grunloh, Fulgenzi, Iacullo, Klemz, and Malek-Robinson were all directly involved in the decision to transfer Plaintiff out of ETP." But beyond this blanket allegation, Plaintiff does little to elucidate key facts, such as whether each or any of these Defendants actually had the authority to transfer Plaintiff.[4] *See Levy v. Pappas*, 510 F.3d 755, 764 (7th Cir. 2007) (affirming dismissal of § 1983 claims against officials in Cook County Treasurer's Office based on officials' assistance with criminal investigation of plaintiff, because "only the State's Attorney ha[d] the power to initiate the criminal proceedings"); *Togba v. Cnty. of Cook*, 48 F. Supp. 2d 1104, 1112 (N.D. Ill. 1999) (dismissing § 1981 claim where plaintiff's allegations showed only that defendant was "the individual in the [employer's] hierarchy responsible for communicating personnel decisions to [the plaintiff]"); *Pummell v. United Airlines*, No. 05-C-

---

[4] Plaintiff's allegations regarding Defendant Travia are even more deficient. As Defendants observed in their response, Travia's name only appears once in Plaintiff's ninety-paragraph complaint and, in that instance, only to allege that Travia had "the authority to direct Plaintiff's daily activities." (Mem. at 10; Compl. ¶ 16.) And while Plaintiff has attached certain emails to the complaint to which Defendant Travia appears to have been copied, these emails provide little insight in to what Defendant Travia's role may have been in Plaintiff's transfer. Absent more, Plaintiff has failed to state a § 1981 or § 1983 claim against Defendant Travia.

5896, 2007 WL 1052497, at *8–9 (N.D. Ill. Mar. 30, 2007) (granting summary judgment on § 1981 claim against defendant corporate security officer who had conducted investigation in to plaintiff's alleged theft because there was no evidence that the defendant "participated in the decisions adverse to Pummel"). Leaving aside Defendant Grunloh, to whom Defendants' motion does not apply, Plaintiff alleges that Defendants Fulgenzi, Iacullo, and Klemz all had "the authority to direct Plaintiff's daily activities." (Compl. ¶¶ 13–15.) But Plaintiff does not allege whether this authority included the ability to order Plaintiff's transfer. (Compl. ¶ 31.) Furthermore, regarding Defendant Malek-Robinson, Plaintiff merely alleges that she had "the authority to recommend tangible employment decisions affecting Plaintiff." (*Id.* ¶ 17.) But "recommend[ing] . . . employment decisions" and making them are very different things. Nothing in Plaintiff's complaint indicates that Defendant Malek-Robinson had the relevant decisionmaking authority. Thus, Plaintiff's allegation that Defendants Fulgenzi, Iacullo, Klemz, and Malek-Robinson "were all directly involved in the decision to transfer Plaintiff" is thus a "naked assertion" that fails to adequately plead a right to relief under § 1981 or § 1983. *Iqbal*, 129 S. Ct. at 1949.

Plaintiff's allegations regarding the individual Defendants' state of mind in transferring Plaintiff are also deficient. As indicated, Plaintiff must sufficiently allege that each individual Defendant "himself [or herself] possessed an 'intent to discriminate on the basis of race.'" *Behnia*, 961 F. Supp. at 1237. Regarding the motivation for Plaintiff's transfer, Plaintiff alleges that: "IDOT represented to Plaintiff that the move was based upon alleged 'operational needs.' However, this was a mere pretext for a racial motivation, *i.e.* to acquiesce to the demands of white subordinate employees for Plaintiff's removal from ETP." (Compl. ¶ 33.) Crucially,

Plaintiff's allegations about "IDOT['s]" intent may be sufficient for Title VII claims but they are not for § 1981 and § 1983 claims, which, again, are concerned with the unlawful actions of individuals. *Daigre*, 2009 WL 2371727 at *2; *Jenkins*, 147 F.3d at 583. If Plaintiff wishes to state claims against the individual Defendants for racial discrimination under § 1981 and § 1983, he must point the finger at each of them instead of relying upon such a blunderbuss approach.

In this vein, Plaintiff's allegations regarding Defendant Hannig, who serves as the Secretary of IDOT, are also inadequate. Plaintiff alleges that Defendant Hannig "was either directly involved in the decision to transfer Plaintiff out of ETP or was informed of the decision by his chief of staff (Defendant Grunloh) and authorized the action." (Compl. ¶ 32.) While Defendant Hannig's authority to transfer Plaintiff cannot be questioned, Plaintiff does not anywhere allege what Defendant Hannig's state of mind was in signing off on Plaintiff's transfer, if he in fact did. We see nothing in Plaintiff's complaint alleging that Defendant Hannig acted with the type of "deliberate or reckless disregard of plaintiff's constitutional rights" required to hold a high-level supervisor like him liable under § 1981 and § 1983. *McPhaul*, 226 F.3d at 566. Furthermore, the assertion that Defendant Hannig was "involved in the decision" is "devoid of 'further factual enhancement[.]'" *Iqbal*, 129 S. Ct. at 1949; *see also Hildebrandt*, 347 F.3d at 1040. Thus, Plaintiff has failed to make sufficient factual allegations against Defendant Hannig "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964–65.

Plaintiff argues that, even if the individual Defendants did not actively participate in Plaintiff's transfer, they "approved, condoned, or turned a blind eye to it[.]" (Resp. at 10 (quoting *Hildebrandt*, 347 F.3d at 1039).) In support of this position, Plaintiff points to several

emails attached to the complaint that supposedly "put all of the Defendants on notice of the constitutional deprivations [Plaintiff] suffered." (*Id.*) As a factual matter, Plaintiff's emails can hardly be said to have "put all of the Defendants on notice." Some Defendants, like Defendant Hannig, are not copied on any of them. None of the Defendants are copied on all of them. And, unlike the complaint, none of the emails attempt to draw the sweeping connection between Plaintiff's reporting on the Eme incident, Defendant Malek-Robinson's supposedly retaliatory investigation, and Plaintiff's subsequent transfer. Furthermore, as a matter of law, it is not enough that Defendants might have been "notified" of Plaintiff's belief that he was being unfairly targeted for a demotion due to his race. The discriminatory purpose standard applicable to racial discrimination claims requires Plaintiff to prove that the individual Defendants were "deliberate[ly] indifferen[t]" to the deprivations Plaintiff allegedly suffered. *McPhaul*, 226 F.3d at 564. Accordingly, we have repeatedly dismissed claims in which a defendant was "notified" of discriminatory actions but "failed to take any remedial action in response to this notification." *Behnia*, 961 F. Supp. at 1238 (dismissing § 1981 claim where defendant was only alleged to have been "notified" of others' discriminatory actions); *see also Daulo*, 892 F. Supp. at 1091–92 (dismissing § 1981 claim where defendant was only alleged to have received letters informing him of others' workplace discrimination against plaintiff).

  Finally, Plaintiff's response also makes several references to the "hostile environment" at ETP due to the "racial harassment" he suffered there and "IDOT['s]" failure "to do anything about it." (Resp. at 11.) In support of Plaintiff's position, he again points to the several emails attached to the complaint. (*Id.*) Plaintiff contends that these emails demonstrate that "[i]t is a fact that the Defendants were fully aware of the hostile environment [Plaintiff] was suffering"

-15-

and yet "they turned a blind-eye to his subordinates' behavior and the hostile environment." (*Id.*)

But as we read Plaintiff's complaint, he is not bringing a hostile work environment claim against the individual Defendants. None of the individual counts in the complaint is labeled as a hostile environment claim, nor do any of the counts use such language. And although Plaintiff's general allegations indicate that he was upset about certain incidents at ETP—specifically, Eme's "use of the n-word" and the inadequate response thereto—these allegations do not "approach[] the level of a hostile environment by being 'so severe or pervasive as to alter the conditions of [his] employment and create an abusive working environment.'" *Williams v. Seniff*, 342 F.3d 774, 791 (7th Cir. 2003) (citations omitted). Indeed, Plaintiff's goal in bringing this lawsuit is to return to ETP, so he must not find the environment there to be so hostile as to be "an abusive working environment." *Id.* (Compl. ¶¶ 65(B), 69(B), 74(B).) Furthermore, the Seventh Circuit has held that "stray remarks and the random use of a racial epithet"—including the "n-word"—"are insufficient to support a hostile environment claim." *Lilly v. Roadway Express, Inc.*, 6 Fed. Appx. 358, at *1 (7th Cir. 2001); *see also McPhaul*, 226 F.3d at 567. Thus, we do not read Plaintiff's complaint as forwarding a hostile work environment claim. If Plaintiff intends to bring such a claim, he should be more direct in saying so in the event he amends his complaint.

Because Plaintiff has failed to adequately allege that Defendants Hannig, Iacullo, Fulgenzi, Travia, Klemz, and Malek-Robinson were personally involved in the decision to transfer Plaintiff from ETP, we grant the motion to dismiss Counts IV, V, and VI against these Defendants for failure to state a claim. We do so without prejudice, however, as Plaintiff may be

able to amend his complaint to cure the deficiencies we have identified. *See Behnia*, 961 F. Supp. at 1238 (dismissing without prejudice § 1981 claim where it was "conceivable, though not likely, that [the plaintiff] [could] amend his complaint to allege direct participation by [the defendant] in the alleged discrimination"). If Plaintiff can do so consistent with Rule 11 and the other applicable pleading requirements, he may file an amended complaint within twenty-one days of the issuance of this opinion.

### III. CONCLUSION

Defendants' motion to dismiss the entirety of the complaint based on Plaintiff's *in forma pauperis* application is denied. Defendants' motion to dismiss Counts IV, V, and VI against Defendants Hannig, Iacullo, Fulgenzi, Travia, Klemz, and Malek-Robinson is granted. Plaintiff's voluntarily withdrawn claims are dismissed. Plaintiff has twenty-one days from the issuance of this opinion to file an amended complaint, if he can do so consistent with Rule 11 and the other applicable pleading requirements. There will be a status hearing in this case on Thursday, September 15, 2011 at 10:30 a.m. The parties or their representatives are required to appear at that hearing. Failure to appear may result in dismissal of this case.

IT IS SO ORDERED.

_____
Honorable Marvin E. Aspen
U.S. District Court Judge

Date: June 21, 2011