**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARVIN HARRISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 C 4674 |
| | ) | Hon. Marvin E. Aspen |
| ILLINOIS DEPARTMENT OF | ) | |
| TRANSPORTATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Marvin Harrison alleges that his employer, the Illinois Department of Transportation ("IDOT"), along with certain IDOT supervisors and officials, William Grunloh, Steve Travia, and Giovanni Fulgenzi, discriminated against him on the basis of his race and retaliated against him when he complained of the discriminatory treatment. Presently before us is Defendants' motion for summary judgment, seeking dismissal of all claims. (Dkt. No. 115.) For the reasons set forth below, we grant the motion in part and deny the motion in part.

## FACTUAL BACKGROUND

We begin with the pertinent facts. Unless otherwise noted, the facts described herein are undisputed and culled from the parties' Local Rule 56.1 statements of fact and exhibits. To the extent that either party objected to certain statements of fact or exhibits, we shall rely on admissible evidence only for purposes of our analysis. *See, e.g.*, *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("The evidence relied upon in defending a motion for summary judgment must be competent evidence of a type otherwise admissible at trial."). We decline to address objections specifically unless warranted.

1

# I.      HARRISON'S JOB HISTORY AND DUTIES

Harrison is an African-American man and has worked for IDOT in Emergency Traffic Patrol ("ETP") since 1995.  (Defs.' SOF ¶¶ 2, 7.)  Having served as a highway maintainer and lead worker, Harrison was promoted to the position of Highway Maintainer Lead/Lead Worker ("Lead/Lead") in 2007.  (*Id.* ¶ 7.)  Harrison received this promotion after filing a previous discrimination lawsuit against IDOT and was the only African-American Lead/Lead at all times relevant to this action.  (Pl.'s SOF ¶ 1.)  Following Harrison's 2007 promotion, several coworkers refused to work with him.  (*Id.* ¶ 2; Pl.'s Ex. 8 (12/26/07 Fulgenzi email noting that "Jose, Mark, and Mike have been calling in sick or refused overtime in lieu of working with Marvin").)

As a Lead/Lead at ETP, Harrison has many duties.  According to IDOT's job description, the Lead/Lead patrols expressways and supervises incident management at accident or disabled vehicle sites.  (Defs.' Ex. D, Fulgenzi Dep. at Ex. 1 (Job Descr.) at 1.)  In that role, the Lead/Lead sets up safety devices, reroutes traffic, clears obstructions on the pavement, and evaluates situations to determine whether emergency assistance is needed.  (*Id.*)  The Lead/Lead alerts the IDOT communications center of any interruptions to traffic flow, reports any damage to State property, and works "to help restore normal traffic flow as quickly and safely as possible."  (*Id.*)  As Harrison described in his deposition, a Lead/Lead must "respond to anything and everything that affects the traffic on the highway," from car fires, to debris in the road, to animals running amok.  (Defs.' Ex. C, Harrison Dep. at 12.)

The Lead/Lead also supervises lead workers and highway maintainers, schedules employees staffed for ETP, determines assignments, issues work rule violations, prepares incident reports, and conducts training and inspections.  (Job Descr. at 1; Harrison Dep. at 11–

12; *see* Pl.'s Ex. 1 (12/18/13 Decl. of Marvin Harrison) ¶ 30 (stating that he was not responsible for the number of employees staffed).)  Typically, Harrison supervises three lead workers and roughly a dozen highway maintainers on each shift.  (Harrison Dep. at 13–14.)  Harrison's duties involve at least two hours of office work per shirt, including personnel tasks as well as dealing with motorists, politicians, upper management, and subordinate employees.  (*Id.* at 15–16.)  As a Lead/Lead, Harrison also ensures that equipment is available and functioning, and occasionally maintains equipment personally.  (*Id.* at 16–18.)  In addition, he may handle special projects, such as coordinating a presidential motorcade.  (*Id.* at 13, 16 (testifying that he also coordinated the NATO summit and may arrange delivery of packages for state officials).)

    As for his job performance, Harrison provided six annual evaluations, covering the 2005-2006 review period through the 2010-2011 review period.[1]  (Pl.'s SOF, Ex. 2.)  In each of the evaluations following his promotion to Lead/Lead, Harrison was rated either "Satisfactory" or "Highly Satisfactory" in all categories.[2]  (*Id.*)  Based on the record before us, Harrison appears to have been meeting IDOT's expectations, at least through June 30, 2011.[3]

## II.    HARRISON'S 2010 TEMPORARY REASSIGNMENT

    The parties do not dispute that, on approximately March 22, 2010, Defendant Grunloh—IDOT's then-Chief of Staff—informed Harrison by phone that he was being reassigned out of

---

[1] Based on the evaluation forms, the IDOT annual review periods run from July 1 through June 30 of the following year.

[2] For reasons unknown, Harrison objected to his 2010-2011 evaluation.  (Pl.'s Ex. 2 (at IDOT 1132).)

[3] Although Defendants objected to Harrison's statement of fact about his performance, we find those objections immaterial.  (*See* Defs.' Resp. to Pl.'s SOF ¶ 3.)  First, the record does not show that Harrison's reassignment to the Kennedy Maintenance Yard for part of 2010, discussed below, affected his evaluation.  Moreover, that evaluation on its face does not indicate whether it relates to his service at the yard, or at ETP, or both.  Second, we reject Defendants' implication that Harrison's 2011-2012 evaluation may not have been positive.  As neither party has submitted that evaluation, the record reflects only Harrison's satisfactory performance through mid-2011.

ETP, over his objection. (Defs.' SOF ¶ 22; Pl.'s SOF ¶ 9.) Harrison was reassigned to work at the Kennedy Maintenance Yard ("the Yard"), where he remained for approximately six months. IDOT ultimately moved Harrison back to ETP, after his repeated requests. (Defs.' Resp. to Pl.'s SOF ¶ 11.) While these basic facts are agreed, the parties dispute the circumstances giving rise to Harrison's transfer, the scope of his duties at the Yard, and the consequences of the move.

### A. Circumstances Surrounding Harrison's Reassignment

In early 2010, IDOT "was aware that personnel issues existed at ETP." (Defs.' SOF ¶ 10.) IDOT does not identify what events lead it to this conclusion. Harrison, however, states that in January 2010 he informed Marie Malek-Robinson—IDOT's Employee Assistance Program Manager—that he heard that other ETP employees had circulated a petition seeking his removal. (Harrison Decl. ¶ 16.)

### 1. Malek-Robinson's Investigation

Whatever the cause, IDOT instructed Malek-Robinson to conduct an investigation, called an Employee Dynamics and Outcomes Assessment, to determine the sources of discord at ETP. (Defs.' SOF ¶ 11.) For her investigation, Malek-Robinson interviewed ETP employees and essentially asked what they liked and disliked about their jobs.[4] (Defs.' SOF ¶ 13.) According to Defendants, though disputed by Harrison, Malek-Robinson received more than 90 negative comments about Harrison, more than any other employee mentioned. (*Id.* ¶ 14.) The interviewed, anonymous employees also gave negative feedback about Anthony DiIacova and Bob Duda, both white managers at ETP who were senior to Harrison. (*Id.* ¶¶ 14, 19–20.)

---

[4] Harrison objects to some of the details and characterizations included in Defendants' statements of fact describing Malek-Robinson's assessment and report, but those objections are largely immaterial for present purposes. (Pl.'s Resp. to Defs.' SOF ¶¶ 10–17; *see* Pl.'s SOF, Ex. 4 (Harrison 1/20/10 email questioning the ongoing investigation).) For example, although Harrison challenges the purpose and scope of Malek-Robinson's investigation and the reliability of her findings, he does not dispute that she conducted an assessment.

Malek-Robinson prepared a report incorporating ETP employee comments, dated March 4, 2010. (*Id.* ¶ 17; *see id.*, Ex. G (8/1/13 Decl. of Marie Malek-Robinson) ¶¶ 17–20 & Ex. 1 attached thereto.)

IDOT asserts that, based on Malek-Robinson's report, it decided to move Harrison, DiIacova, and Duda out of ETP. (Defs.' SOF ¶ 19.) The record shows that IDOT permanently transferred DiIacova and Duda to other positions.[5] (Defs.' SOF ¶ 19; Defs.' SOF, Ex. H (11/14/13 Decl. of Steve Travia) ¶¶ 4–8; *see* Harrison Decl. ¶ 25.)

On February 5, 2010, Harrison filed an internal complaint against Malek-Robinson.[6] (*See* Malek-Robinson Decl. ¶ 23; Defs.' SOF, Ex. N (2/5/10 Harrison Internal Discr./Harassment Compl.).) Harrison complained that he was forced to speak with Malek-Robinson without representation and without understanding the purpose of her investigation. (Defs.' SOF, Ex. N.) He alleged that this questioning constituted ongoing harassment on the basis of his race, as well as retaliation. (*Id.*) Malek-Robinson has stated that she did not know about Harrison's internal complaint when she performed her assessment. (Malek-Robinson Decl. ¶ 23.)

### 2. The Hate-Based Threat

Around the same time as Malek-Robinson's investigation, and approximately two weeks before his transfer to the Yard, Harrison received a phone call from Ellen Schanzle-Haskins, IDOT's Chief Counsel, and Elbert Simon, IDOT's Chief of the Bureau of Civil Rights. (Harrison Decl. ¶ 19; Pl.'s SOF ¶ 8.) In their conversation, Schanzle-Haskins informed Harrison that one or more of his subordinates had made a race-based threat on his life, on Facebook. (Harrison Decl. ¶ 19; Harrison Dep. at 31–34, 38–39.) Schanzle-Haskins told Harrison that

---

[5] Although Harrison implies that DiIacova and Duda requested or consented to their transfers, there is no evidence to support that characterization. (*See* Harrison Decl. ¶ 25.)

[6] Harrison has had internal and external complaints of civil rights violations against IDOT going back to at least 2004. (Pl.'s SOF ¶ 5.)

IDOT had contacted the Hate Crimes division of the FBI to investigate. (Harrison Decl. ¶ 19; Harrison Dep. at 31–41.) Simon and Schanzle-Haskins then asked Harrison if he would be willing to transfer to maintenance. (Harrison Decl. ¶ 19; Harrison Dep. at 33–34; *see also* Defs.' SOF, Ex. K (7/19/13 Decl. of Ellen Schanzle-Haskins) ¶¶ 3–6.) Harrison declined to do so because he felt a maintenance position would involve less authority, he would lose money, and it was unfair that he should move rather than those who threatened him. (Harrison Decl. ¶ 20.)

Shortly thereafter, on approximately March 22, 2010, Grunloh called Harrison and told him that he was being transferred to the Yard against his wishes. (Harrison Decl. ¶ 21; Harrison Dep. at 33, 43–44.) Grunloh did not provide Harrison any concrete reason for the forced transfer, other than "operational needs." (Harrison Decl. ¶ 21.) It is undisputed that Grunloh typically did not deal with individual staffing and discipline issues at ETP. (Defs.' SOF ¶ 84.) Indeed, Grunloh testified that he made only two such phone calls as Chief of Staff, and the only call he ever made to a Lead/Lead about a reassignment was the call to Harrison. (Defs.' SOF, Ex. B, Grunloh Dep. at 12 (stating that the other call had been to ask the IDOT assistant secretary for his resignation).) Grunloh had never heard of Harrison until the Secretary of IDOT asked him to place the call on March 22, 2010, and Grunloh did not know that Harrison is African-American. (*Id.* ¶ 85; Defs.' SOF, Ex. M (7/22/13 Decl. of William Grunloh) ¶¶ 3–7, 11.) According to his declaration, Grunloh also did not know personally about the "operational needs" at the Yard. (Defs.' SOF ¶¶ 85–86; Grunloh Decl. ¶ 7; *see also* Grunloh Dep. at 8, 11–15.)

Like Grunloh, Schanzle-Haskins also informed Harrison, though after his move, that he was reassigned because they needed help at the Yard. (Harrison Dep. at 41–42.) Yet Schanzle-Haskins stated in a May 20, 2010 email to Harrison that "we transferred you . . . for your safety

due to the threats on your life that are part of an FBI hate crimes investigation." (Pl.'s SOF, Ex. 3 (5/20/10 Schanzle-Haskins email to Harrison, Grunloh, Simon and others) (further stressing that he was not being punished but that IDOT had an obligation to try and help him).)[7]

Soon after his transfer to the Yard, Harrison met with the FBI about the threat. (Pl.'s Resp. to Defs.' SOF ¶ 32; Harrison Dep. at 34–41.) The FBI investigators showed Harrison the Facebook post that IDOT deemed to be threatening, but Harrison did not learn the identity or race of the poster. (Pl.'s Resp. to Defs.' SOF ¶¶ 32–33; Harrison Dep. at 35–36.) On or by April 1, 2010, the FBI completed its investigation and concluded that the threat was unfounded. (Pl.'s SOF, Ex. 3 (Harrison's response to 5/20/10 Schanzle-Haskins email).)

IDOT did not transfer Harrison back to ETP at the conclusion of the FBI investigation. Rather, after Harrison's repeated requests, IDOT reassigned him to ETP after approximately six months at the Yard. (Defs.' Resp. to Pl.'s SOF ¶ 11; Harrison Decl. ¶¶ 23–25; *see also* Pl.'s SOF, Ex. 21 (assorted emails from Harrison requesting to return to ETP and to be made whole on missed overtime).) Harrison never received an explanation of the "operational needs" that allegedly necessitated his move to the Yard. (Harrison Decl. ¶ 26.)

### B. Harrison's Employment at the Yard

While working at the Yard, Harrison retained his Lead/Lead title. (Defs.' Resp. to Pl.'s SOF ¶ 10; Harrison Dep. at 24.) Nonetheless, his job duties changed somewhat. While Harrison continued to supervise employees at the Yard, for example, he supervised one lead worker rather than three. (Harrison Dep. at 24.) Harrison stated in his declaration that the lead worker reported to the Yard Tech (or manager), rather than Harrison. (Harrison Decl. ¶ 22.) The Yard

---

[7] Defendants' argument that Schanzle-Haskins' May 20, 2010 email is inadmissible hearsay lacks merit. (Reply at 5.) The email, as submitted by Harrison, is admissible as the statement of a party opponent pursuant to Federal Rule of Evidence 801(d)(2). In any event, the underlying fact is also before us via Harrison's declaration and deposition testimony.

Tech gave Harrison assignments for each shift, which he delegated to the lead worker and highway maintainers. (Harrison Dep. at 25–30.) Harrison did not handle scheduling at the Yard and spent about one hour of each shift on paperwork. (*Id.* at 24–26.)

For the rest of his shift, Harrison went out on assignment with the other maintenance employees and performed tasks such as cutting trees, cleaning sewers, picking up paper, and dispersing homeless people from underpasses. (*Id.* at 23–24, 28–31.) Harrison did not patrol the highways, as he did at ETP, because maintenance employees are assigned particular tasks for the shift and also because they lack the proper equipment. (*Id.* at 26–27.) Harrison drove a pickup truck while in maintenance, which was not equipped with the lights necessary to make stops for emergencies. (*Id.* at 27–28.) Harrison testified that he performed the same work as the Yard's highway maintainers. (*Id.* at 30; *see also* Harrison Decl. ¶ 22.) He was not responsible for the availability or functionality of equipment. (Harrison Dep. at 31.) On the whole, Harrison felt that his duties at the Yard were menial and that the reassignment "was humiliating." (Harrison Decl. ¶ 23; *see also id.* ¶ 22 ("I went from saving lives to cleaning up trash on the side of the road and it seemed like I was being punished for someone else's racism.").)

In addition to concerns about his duties,[8] Harrison complained to IDOT that he was losing overtime income while stationed at the Yard.[9] (*See, e.g.*, Pl.'s SOF, Ex. 21.) By March 26, 2010—at the very beginning of his reassignment—Harrison was inquiring about his benefits during his temporary reassignment to the Yard, including overtime. (Pl.'s SOF, Ex. 21

---

[8] Harrison also testified that his commute was longer while he worked at the Yard, that his shift was undesirable, and that he wore civilian clothes instead of a uniform with a badge. (Harrison Dep. at 51–54.) Harrison also repeatedly expressed concern that the transfer would affect his retirement scale and delay his retirement date. (Pl.'s SOF, Ex. 21.)

[9] Harrison apparently concedes that his regular salary was not negatively impacted by the reassignment to the Yard. (Pl.'s Resp. to Defs.' SOF ¶ 26.) Indeed, the record demonstrates that his salary increased in accordance with an applicable labor contract. (Defs.' SOF, Ex. J (8/7/13 Decl. of Laura Siano) ¶ 3.)

(at IDOT 41, 3/26/10 emails to Robert Anderson).)  He filed a charge of discrimination with the

EEOC on March 29, 2010, alleging that his benefits had been reduced as a result of the transfer.

(Defs.' SOF, Ex. O.)  About two months later, he emailed Schanzle-Haskins about the financial

strain on his family, explaining that he was losing about $7000 a month in overtime that he

would have earned at ETP.  (Pl.'s SOF, Ex. 21 (at IDOT 117, 5/20/10 email to Schanzle-

Haskins) (also asking to be reassigned to a location closer to his home)).)  In an email to Simon

and others, dated June 4, 2010, Harrison reiterated that he was losing $6000 to $7000 per month

in overtime.  (Pl.'s SOF, Ex. 21 (at IDOT 480, 6/4/2010 email to Simon, Anderson, and Lance

Jones).)  Two weeks later, Harrison again requested to return to ETP, to receive all of his missed

overtime pay, and to be reinstated with his vehicle, office, and shift.  (*Id.*)

In response to Harrison's complaints, IDOT issued Harrison payments for back wages,

representing the overtime he missed while at the Yard from March 26, 2010 through

September 2010.  (Defs.' SOF ¶ 27.)  By the end of that year, IDOT paid Harrison a gross total

of $33,735.76 in unearned overtime compensation.  (*Id.*; Defs.' SOF, Ex. I (7/16/13 Decl. of

Holly Guppy) ¶¶ 3–6; Siano Decl. ¶¶ 4–7.)  Harrison contends that this amount was less than it

should have been, based on his own calculations.  (Harrison Decl. ¶ 35; Harrison Dep. at 49–51.)

Harrison testified to a $15,000 discrepancy, (Harrison Dep. at 50), but his calculations are not

part of the record.[10]

---

[10] Harrison argues that facts about his income while at the Yard are irrelevant to the pending
motion, because these facts concern only damages.  (Pl.'s Resp. to Defs.' SOF ¶¶ 26–27.)  This
argument is misplaced, however.  Changes to an employee's income based on employer conduct
is relevant to evaluating whether that conduct was materially adverse, an essential element of
Harrison's discrimination claims.  *See, e.g.*, *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 612–13
(7th Cir. 2001).

## II. SUSPENSION BASED ON THE EVENTS OF AUGUST 21, 2011

Ultimately, Harrison returned to ETP in the fall of 2010. His return appears to have been uneventful until Sunday, August 21, 2011. At around noon that day, a semi-truck rolled over southbound on the Dan Ryan Expressway, snarling the already heavy traffic caused by the Chicago Air and Water Show. (Pl.'s Resp. to Defs.' SOF ¶ 36.)

Harrison was the only Lead/Lead working at the time and was on the scene for at least five hours, including after his shift ended. (*Id.* ¶¶ 37, 42.) Harrison was staffed with a number of newer employees. As a result, he was both supervising them and personally handling tasks at the scene, such as attempting to upright the trailer. (*Id.* ¶¶ 38–39; *see* Harrison Dep. at 73–75.) Harrison testified that he could not remove the trailer from the roadway because of equipment failures, because he did not know what was inside the trailer, and because the load kept shifting. (Pl.'s Resp. to Defs.' SOF ¶ 39; Harrison Dep. at 73–75, 78–80; *see also* Pl.'s SOF, Exs. 11–13 (co-worker statements about the August 21, 2011 events).) Around 5:00 p.m., Harrison instructed police officers at the scene to call in a private towing company, which would have better equipment for that job. (Pl.'s Resp. to Defs.' SOF ¶¶ 40–41; Harrison Dep. at 78–81.) The parties dispute which lanes of traffic were closed during this incident, for how long, and whether they could have been reopened sooner. (*See* Pl.'s Resp. to Defs.' SOF ¶¶ 36, 43–44, 48–52; Defs.' Resp. to Pl.'s SOF ¶¶ 16–19, 26.) All lanes of traffic were open again around 8:15 p.m. (*See* Pl.'s SOF, Ex. 10 at 15 (8/21/11 Ops. & Commc'ns Ctr. Incident Report).)

IDOT management, including Defendants Travia and Fulgenzi,[11] investigated the handling of this August 21, 2011 traffic incident. (Pl.'s Resp. to Defs.' SOF ¶ 47.) IDOT identified several problems with Harrison's conduct and decisionmaking. (*See, e.g.*, Defs.' SOF,

---

[11] At the time, Travia was IDOT's Bureau Chief of Traffic and Fulgenzi was the Personnel Services Manager. (Pl.'s Resp. to Defs.' SOF ¶¶ 5–6.)

Ex. D (11/15/13 Decl. of Giovanni Fulgenzi) ¶¶ 23–38.)  IDOT charged Harrison with poor

supervision, unprofessional conduct, poor public image, and poor work performance.  (*Id.* ¶¶ 31–

33; *see* Fulgenzi Decl., Ex. 4 (Statement of Charges).)  Harrison received a fifteen-day

suspension, which was later reduced to three days.  (Pl.'s Resp. to Defs.' SOF ¶¶ 54, 56;

Harrison Dep. at 83–86.)  IDOT also suspended two other employees, who work in the

Communications Center, for their job performance on August 21, 2011.  (Defs.' SOF ¶¶ 60–61.)

Harrison objects to many of the facts asserted by Defendants—about the August 21, 2011

incident, about his performance, about the adequacy and impartiality of the ensuing

investigation, and about the individual defendants' involvement in the decision to suspend him—

but we need not recount all of these disputed facts.  More importantly for present purposes,

Harrison contends that Defendants launched their investigation and disciplined him despite never

having done so for white Lead/Leads in similar situations.  (Harrison Decl. ¶ 31.)

Harrison states that, since he has worked at ETP, IDOT has neither investigated, nor

disciplined other Lead/Leads for their accident management despite other partial or full lane

closures lasting five hours or more.  (*Id.* ¶¶ 28, 31; Defs.' Resp. to Pl.'s SOF ¶ 23.)  The record

includes IDOT Operations and Communication Center Incident Reports documenting a total of

thirteen incidents that involved lane closures from December 14, 2007 through August 21, 2011.

(Pl.'s SOF, Ex. 10.)  These reports show that lane closures occurred, but they do not indicate

whether any investigation or discipline followed for any ETP employee.  (*Id.*)  Harrison did not

identify any particular Lead/Leads working during these other lane closure incidents.[12]

Nonetheless, Harrison claims that "no other white Lead/Lead in the history of [ETP] had

been subject to disciplinary hearings for any reason whatsoever."  (Harrison Dep. at 98.)

---

[12] The reports themselves do not consistently identify either who was working or their role, and
Harrison has not explained the notes in the reports.

Although Harrison acknowledged that he is not involved in discipline for other Lead/Leads, he testified that is aware that white Lead/Leads have not been punished based on his observations over the years and on what he has heard around ETP.  (*Id.* at 98–99.)  Harrison identified five white ETP employees, either Lead/Leads or lead workers, who he asserts engaged in misconduct and were not punished.[13]  (*Id.* at 87, 89–95; Harrison Decl. ¶ 31.)  Harrison stated that these individuals: (1) dragged semis down the highway, causing damage or fire; and/or (2) damaged IDOT vehicles, such as the boom on a truck, necessitating expensive repairs.  (Harrison Decl. ¶ 31; Harrison Dep. at 90–94.)  Harrison did not personally witness these events because the other employees were not working on his shift.  (Harrison Dep. at 93–95.)  Harrison bases his claim on what he heard from others at ETP, and he further testified that he knows these employees were not disciplined because they told him so.  (*Id.* at 93–95.)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted).  Once the moving party meets this burden of production, the nonmoving

---

[13] The five white, male ETP employees identified by Harrison as comparators are: Mark Jercha, Mitchell English, Matt McKissick, Vince Serafini, and Hal Hallahan.  (Harrison Dep. at 90–94; Harrison Decl. ¶ 31.)  Serafini and English were lead workers.

party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c).

In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513. In addition, "[w]e apply the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility." *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000) (citing *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491 (7th Cir. 2000)); *see Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) (stressing that the court cannot make credibility determinations, weigh evidence, and either draw or reject inferences, at the summary judgment stage).

## ANALYSIS

Harrison filed this lawsuit on July 27, 2010, in the midst of his reassignment to the Yard. The operative complaint, filed September 17, 2013, includes nine counts and alleges that IDOT, Grunloh, Travia, and Fulgenzi engaged in race discrimination and retaliation in violation of federal law. (*See* Compl. (Dkt. No. 106).) Generally speaking, the first five counts challenge Defendants' decision to temporarily reassign Harrison to the Yard, while the latter four counts challenge the imposition of the suspension for allegedly mishandling the August 21, 2011 incident. (*Id.* ¶¶ 42–89.) We turn now to the merits of Defendants' motion, which seeks summary judgment on all counts, and we begin with Harrison's claims stemming from his 2010 temporary reassignment.

## I.     CLAIMS BASED ON HARRISON'S TRANSFER TO THE YARD

Harrison asserts several claims based on his reassignment to the Yard for six months

in 2010.  Counts I and II allege that IDOT discriminated against Harrison on the basis of his race

and retaliated against him, in violation of Title VII.  Harrison brings Counts III through V against

Grunloh, in his individual capacity, for discrimination and retaliation under §§ 1981 and 1983.[14]

### A.     Harrison's Title VII Race Discrimination Claim, as against IDOT (Count I)

Harrison utilizes both the direct and indirect methods for proving his discrimination claim

against IDOT in Count I.  *See, e.g.*, *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir.

2007) (holding that a plaintiff can prove discrimination using the direct or indirect method).  We

address each approach in turn.

#### i.     Indirect Method

Under the indirect method, articulated first in *McDonnell Douglas Corporation v. Green*,

411 U.S. 792, 93 S. Ct. 1817 (1973), Harrison must establish a prima facie case of

discrimination.  The prima facie case requires proof that: (1) Harrison is a member of a protected

class; (2) his job performance met his employer's legitimate expectations; (3) he suffered an

adverse employment action; and (4) at least one similarly-situated employee not in his protected

class was treated more favorably.  *See Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596,

599–600 (7th Cir. 2010); *Martino v. MCI Comm'cn Servs., Inc.*, 574 F.3d 447, 453 (7th Cir.

2009); *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009); *Wyninger v. New Venture

Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004).  If the elements are established, discrimination is

inferred and the burden of production shifts to Defendants to raise a legitimate,

---

[14] Although Harrison also brings a retaliation claim in Count IV against Grunloh under Title VII,
as well as under § 1981, that claim cannot stand.  It is well-settled that Title VII does not impose
individual liability on supervisory employees.  *See, e.g.*, *Williams v. Banning*, 72 F.3d 552, 554–
55 (7th Cir. 1995).

nondiscriminatory reason for the adverse action. *Naik*, 627 F.3d at 600; *Antonetti*, 563 F.3d at 591. Once a legitimate reason is offered, the inference of discrimination disappears, and Harrison must establish that the offered reason is a pretext for unlawful discrimination. *Naik*, 627 F.3d at 600; *Antonetti*, 563 F.3d at 591. Here, there is no question that Harrison falls within a protected class. We assume for present purposes that Harrison was meeting IDOT's expectations and focus on the parties' disputes concerning the third and fourth elements of the prima facie case.

### a. Adverse Action

Courts have explained that the definition of adverse employment action is "generous," but "is still subject to certain limitations." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). "At the very least," a plaintiff must show "some quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference." *Id.*; *see Herrnreiter v. Chi. Housing Auth.*, 315 F.3d 742, 744 (7th Cir. 2002). Under Title VII, "an adverse employment action is a significant change in the claimant's employment status such as hiring, discharge, denial of promotion . . . or an action that causes a substantial change in benefits." *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); *Oest*, 240 F.3d at 612–13. "[M]ere inconvenience or an alteration of job responsibilities" is insufficient to show adverse employment action, but "reassignment to a position with significantly different job responsibilities" can rise to that level. *Rhodes*, 359 F.3d at 504 (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Determining whether an employer's conduct constitutes adverse employment action is a fact-specific inquiry. *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002); *Oest*, 240 F.3d at 613.

Defendants contend that Harrison's temporary reassignment to the Yard does not constitute an adverse action because he retained his title, performed substantially the same duties at the Yard as he had at ETP, and received the same pay and benefits. (Mem. at 4–5.) We agree with Defendants that evidence about Harrison's title, pay, and benefits do not demonstrate that he suffered an adverse employment action. Indeed, it is undisputed that Harrison retained his job title and that his base pay increased while at the Yard. (Pl.'s Resp. to Defs. SOF ¶ 26.) In addition, although Harrison alleges that the overtime backpay he received for missed overtime was deficient, he has not offered any evidence to support this claim. For example, he has not introduced his own backpay calculations, or data about overtime compensation earned by ETP Lead/Leads during that timeframe. Nor has Harrison raised a question of fact about IDOT's calculations with evidence of some flaw in the formula used to set the backpay amount. He testified that he did not know IDOT's formula and that his calculations showed a $15,000 shortage in the compensation received. (Harrison Dep. at 49–51.) But a reasonable trier of fact could not infer from this self-serving and uncorroborated testimony that Harrison lost wages as a result of his reassignment to the Yard.

Nonetheless, Harrison argues that the changes to his job duties at the Yard constituted an adverse employment action. Defendants assert that Harrison's duties did not change, as he continued to supervise workers and clear roadway obstructions. (Mem. at 4–5.) Based on our review of the record, however, we agree with Harrison that a reasonable jury could find that he suffered an adverse action when transferred to the Yard, even though it did not result in reduced pay. Harrison stated that once he started at the Yard, he realized that they did not previously have a Lead/Lead simply because they did not need one. (Harrison Decl. ¶ 22.) He testified that at ETP, he supervised three lead workers and about a dozen highway maintainers per shift. At

the Yard, he supervised one lead worker, who in reality reported directly to the Yard Tech rather than Harrison. (*Id.*; *see* Harrison Dep. at 24–31.) The Yard Tech gave Harrison assignments for the crew each day, whereas Harrison personally determined assignments for his workers at ETP. (Harrison Dep. at 11–12, 25–30.) Although Harrison often spent several hours each shift at ETP on office work, including personnel tasks and dealing with upper management, he spent much less time (at least 50% less) in the office at the Yard. And at the Yard, Harrison did not handle employee scheduling or coordinate special projects, as he did at ETP. (*Id.* at 15–16, 24–26.)

In addition to these changes to his supervisory duties, Harrison's day-to-day tasks at the Yard differed from his routine at ETP. Although Harrison occasionally performed manual or maintenance work at ETP, (Harrison Dep. at 16–18), his primary duty was to patrol the highways and oversee IDOT's response to accidents and incidents on the highways, (*id.* at 11–18). *See also* Job Descr. at 1.) Yet at the Yard, Harrison performed the same tasks as the highway maintainers, such as cutting trees and cleaning sewers. (Harrison Dep. at 23–24, 28–31.) The record thus suggests that IDOT removed Harrison from the seemingly more urgent, more public work performed by ETP and sent him to the Yard, against his wishes, to work on mundane tasks. Such a transfer could objectively represent a significant change in Harrison's job conditions. *See Tart v. Ill. Power Co.*, 366 F.3d 461, 473–76 (7th Cir. 2004); *Herrnreiter*, 315 F.3d at 744–45 (describing the types of cases where a lateral transfer can constitute an adverse employment action); *Oest*, 240 F.3d at 612–13 (noting that an adverse change "might be indicated by . . . significantly diminished material responsibilities"). We leave it to the jury to determine whether these changes to Harrison's supervisory and daily duties are "more than a mere inconvenience or an alteration of job responsibilities." *Oest*, 240 F.3d at 612 (internal quotation omitted).

### b.    Similarly-Situated Comparators

We turn then to the fourth element of the prima facie case, which requires Harrison to demonstrate that at least one other similarly-situated individual, outside his protected class, was treated more favorably. *Naik*, 627 F.3d at 599–600. Coworkers are "similarly situated" if "the putative similarly situated employees were directly comparable to the plaintiff in all material respects." *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 395 (7th Cir. 2010) (internal quotation omitted). As a matter of common sense, "this inquiry typically examines whether the individuals dealt with the same supervisor, were subject to the same standards, or engaged in similar conduct." *Larson v. Portage Twp. Sch. Corp.*, 293 F. App'x 415, 419–20 (7th Cir. 2008); *see Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009). A plaintiff must show that he and an alleged comparator "engaged in similar conduct without such different or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Hanners v. Trent*, 674 F.3d 683, 692–93 (7th Cir. 2012) (quotations omitted); *see Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2004).

For his part, Harrison does not identify any comparators with respect to his race claim based on his reassignment to the Yard. (Resp. at 11.) He does not claim, for example, that a non-African-American employee was subjected to similar threats but was not transferred out of ETP. "Without such a point of comparison," no jury could find that Harrison suffered discriminatory treatment. *Bilal v. Rotec Induc.*, 03 C 9220, 2006 WL 756066, at *3 (N.D. Ill. Mar. 24, 2006); *see Campbell v. Adventist Hinsdale Hosp.*, 526 F. App'x 650, 653 (7th Cir. 2013).

Considering this claim as framed by Defendants, Harrison also fails to identify any comparable ETP employees who were treated better following Malek-Robinson's assessment.

(Resp. at 11.)  Defendants contend that DiIacova and Duda were similarly-situated to Harrison, based on the amount of negative comments Malek-Robinson received from their co-workers during the 2010 assessment.  (Mem. at 6–7.)  It is undisputed that IDOT permanently transferred DiIacova and Duda out of ETP.  (Defs.' SOF ¶ 19.)  The record thus indicates that Harrison was treated the same, if not *better*, than two white managers who were reassigned due to Malek-Robinson's findings.  As such, the record does not support an inference of discrimination, and Harrison has failed to make out a prima facie case using the indirect method.

### ii.    Direct Method

Under the direct method, Harrison may show through either direct or circumstantial evidence that his "employer's decision to take the adverse job action was motivated by an impermissible purpose, such as [his] race."  *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 529 (7th Cir. 2003); *see Phelan v. Cook Cty.*, 463 F.3d 773, 779–80 (7th Cir. 2006).  Direct evidence of discrimination is evidence that would show a clear acknowledgment of discriminatory intent by the employer.  *See, e.g., Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (explaining that direct evidence is an "outright admission by the decisionmaker that the challenged action was undertaken because of the [employee's] race").

As Defendants point out, Harrison concedes that IDOT never openly admitted that it reassigned him to the Yard because of his race.  (Mem. at 3–4.)  Contrary to Defendants' contention, this lack of "smoking gun" evidence does not foreclose Harrison's claim.  "Direct proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion" and may include "circumstantial evidence which suggests discrimination albeit through a longer chain of inferences."  *Luks v. Baxter Healthcare Corp.*, 67

F.3d 1049, 1052 (7th Cir. 2006); *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2009).

Thus, Harrison may succeed under the direct method by presenting circumstantial evidence that sets out a "convincing mosaic of discrimination," *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994), from which a jury may reasonably infer intentional discrimination. *Luks*, 67 F.3d at 1053 (observing that even if evidence is not a "convincingly rich mosaic . . . it is enough that the circumstances give rise to a reasonable and straightforward inference" of discrimination); *see Silverman v. Board of Educ. of Chi.*, 637 F.3d 729, 733–34 (7th Cir. 2011); *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903–04 (7th Cir. 2006); *Volovsek v. Wis. Dep't of Agric., Trade & Cons. Prot.*, 344 F.3d 680, 689 (7th Cir. 2003). In *Volovsek*, the Seventh Circuit reiterated that such circumstantial evidence typically includes:

> (1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently; or (3) evidence that the employee was [adequately performing] the [job in question] and [yet was disciplined,] and the employer's reason for the difference in treatment is a pretext for discrimination.

*Id.* at 689–90 (citing *Troupe*, 20 F.3d at 736). These three forms of circumstantial evidence can be used independently or in the aggregate to "provide a basis for drawing an inference of intentional discrimination." *Troupe*, 20 F.3d at 736; *Coleman v. Donahoe*, 667 F.3d 835, 860–62 (7th Cir. 2012); *see Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 632 (7th Cir. 2009) (noting that the mosaic need not be "rich and varied" so long as "what evidence there is adds up to discriminatory intent").

Harrison contends that IDOT's decision to transfer him to the Yard was based on his race because it was based on a coworker's racist threat. (Resp. at 10.) According to Harrison, IDOT chose to punish him, the victim, instead of investigating and disciplining those who threatened

him.  (*Id.*)  Harrison argues that IDOT thus capitulated to the racism he claims was prevalent at ETP.[15]  (*Id.*)  For their part, Defendants insist that the evidence before us does not point directly to any discriminatory intent on the part of IDOT.  (Reply at 5–6.)  We acknowledge that this case presents a close call.  Construing the facts and drawing all reasonable inferences in Harrison's favor, as we must, we find that Harrison has raised a question of fact as to IDOT's motivations.

The circumstances surrounding IDOT's decision, as well as its conflicting rationales, could lead a jury to conclude that race was a factor here.  Quite simply, there is a question of fact as to why IDOT transferred Harrison to the Yard at all—was it because of his race, or the perceived threat to his safety alone, or because of Malek-Robinson's findings about morale at ETP, or some combination of these factors?  Why did IDOT force the reassignment, if Harrison was unwilling to move despite his knowledge of the threat?  Why did IDOT enlist Grunloh to make the call to Harrison, when he was not typically involved in such personnel matters and had never heard of Harrison previously?  If IDOT based its decision strictly on the allegedly racist threat to his safety,[16] why did it not return him to ETP immediately upon the conclusion of the FBI investigation?  Why did it wait six months, during which Harrison complained repeatedly about his post at the Yard?  And if IDOT based its decision on low morale at ETP, as it claims, why did it allow Harrison to return at all?  The two conflicting and disputed rationales before us—both with some support in the record—could allow a jury to find IDOT's explanation pretextual.  *See Simple v. Walgreen Co.*, 511 F.3d 668, 671 (7th Cir. 2007) (noting that "a finding of pretext . . . can also be independent evidence of discrimination"); *Appelbaum v.*

---

[15] Harrison did not offer any caselaw in support of his position, nor does he have a hostile work environment claim.

[16] The record before us does not indicate the identity or race of the individual who posted the comment on Facebook.  As far as we can tell, the post itself was fairly ambiguous.  Nonetheless, because IDOT perceived the comment as a credible hate-based threat worthy of calling the FBI Hate Crimes division, we shall do the same.  (*See, e.g.*, Schanzle-Haskins Decl. ¶¶ 3–4.)

*Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) ("One can reasonably infer pretext from an employer's shifting or inconsistent explanations."); *Troupe*, 20 F.3d at 736. In light of these open and material questions, which touch on intent and credibility, we conclude that this claim must be heard by a jury. *Michas*, 209 F.3d at 692.

### B.    Harrison's Title VII Retaliation Claim, as against IDOT (Count II)

In Count II, Harrison alleges that IDOT transferred him to the Yard in retaliation for his numerous complaints about discrimination at ETP.[17]  (Resp. at 13–14.)  A plaintiff may prove retaliation using either the direct or the indirect method. *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008); *Metzger v. Ill. State Police*, 519 F.3d 677, 681 (7th Cir. 2008). Under the direct method, at issue here,[18] a plaintiff "must present evidence, direct or circumstantial, showing that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between the two." *Argyropoulos*, 539 F.3d at 733; *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005). As previously discussed, Harrison suffered a materially adverse action when reassigned to the Yard. Defendants do not contend that Harrison did not engage in protected activity. We therefore focus on the third element, which requires Harrison to show that, but for his protected activity, IDOT would not have transferred him to the yard. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, — U.S. —, 133 S. Ct. 2517, 2533 (2013); *Hobgood v. Ill. Gaming Comm'n*, 731 F.3d 635, 643 (7th Cir. 2013).

In support of his clam, Harrison points to the temporal proximity between his complaints and his transfer to the Yard. (Resp. at 14.) Harrison briefly refers to several complaints he

---

[17] Harrison also alleges in Count II that his 2011 suspension was retaliatory, but we will address that claim later.
[18] Based on Harrison's brief, we assume that he is pursuing this claim using the direct method only, and we analyze it accordingly. (Resp. at 13–14.) As Harrison has not identified any similarly-situated comparators for this retaliation claim, he could not withstand summary judgment using the indirect method.

raised about discrimination from 2004 to 2009.  (*Id.*)  The record shows that Harrison's

February 5, 2010 internal complaint about Malek-Robinson and her investigation is the protected

activity temporally closest to the transfer decision, which apparently took place six weeks later

on March 22, 2010.  (Defs.' SOF, Ex. N; Harrison Decl. ¶ 21; Harrison Dep. at 33, 43–44;

Grunloh Decl. ¶ 3; Grunloh Dep. at 11.)

As Defendants point out, "suspicious timing alone is almost always insufficient to

survive summary judgment."  *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675

(7th Cir. 2011); *Burks v. Wisconsin Dep't Transp.*, 464 F.3d 744, 758–59 (7th Cir. 2006); *Oest*,

240 F.3d at 616.  Unless the "adverse impact comes 'on the heels' of the protected activity,"

additional evidence beyond suspicious timing is typically necessary for a factfinder to infer

retaliatory motive.  *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (leaving the

question of intent to the jury where defendant recommended plaintiff's termination the day after

she complained about disability discrimination); *Loudermilk v. Best Pallet Co.*, 636 F.3d 312,

315 (7th Cir. 2011) (leaving the question of intent to the jury where defendant fired plaintiff on

the spot as he presented a note describing alleged discriminatory treatment, and within about

three weeks of his first complaint of discrimination); *see Coleman*, 667 F.3d at 860–61.

Typically, such an inference is warranted only if "no more than a few days" has elapsed

"between the protected activity and the adverse action."  *Kidwell v. Eisenhauer*, 679 F.3d 957,

966 (7th Cir. 2012); *see Loving v. Lew*, 512 F. App'x 616, 619 (7th Cir. 2013).  The Seventh

Circuit has previously held that intervals of five weeks and seven weeks are insufficient to raise

an inference of causation.  *Kidwell*, 679 F.3d at 967; *Argyropoulos*, 539 F.3d at 734.  Consistent

with these authorities, Harrison's retaliation claim with respect to his reassignment cannot stand.

The six-week gap between his internal complaint and his transfer to the Yard is simply too long,

without other supporting evidence, to permit the necessary inference of retaliatory motive. (Resp. at 14 (relying exclusively on temporal proximity to show causal connection).)

Even with truly suspicious timing, a plaintiff must prove that "the person who decided to impose the adverse action knew of the protected conduct." *Kidwell*, 679 F.3d at 966 (internal quotation omitted); *Porter v. City of Chi.*, 700 F.3d 944, 957–58 (7th Cir. 2012); *Leitgen*, 630 F.3d at 958. Here, Harrison does not articulate, and the record does not reveal, whether decisionmakers at IDOT knew about his internal complaint against Malek-Robinson. Grunloh, for example, testified that when he called Harrison on March 22, 2010, he did not know anything about Harrison, his history of protected activity, or his lawsuit. (Grunloh Decl. ¶¶ 12–13.) The record is silent about what happened with Harrison's complaint against Malek-Robinson, and who knew about it. At this juncture, however, it is Harrison's burden to provide evidence of the requisite causal connection, and he has failed to do so. As a result, we grant summary judgment in favor of Defendants on Harrison's retaliation claim against IDOT based on his transfer to the Yard.

### C. Harrison's Claims against Grunloh (Counts III–V)

In Counts III and IV, Harrison alleges that Grunloh, in his individual capacity, violated 42 U.S.C. § 1981 by engaging in race discrimination as well as retaliation. Count V alleges a claim against Grunloh under 42 U.S.C. § 1983 on the same facts but framed as a violation of the Equal Protection Clause.[19] To analyze these claims, we use the principles applied to Title VII claims. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007); *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003).

---

[19] In addition, Harrison's § 1983 claim provides the enforcement mechanism for his § 1981 claims. *Campbell v. Forest Pres. Dist. of Cook Cty.*, 752 F.3d 665, 671 (7th Cir. 2014) (holding that "§ 1983 remains the exclusive remedy for violations of § 1981 committed by state actors"); *Bonner v. Village of Burnham*, 14 C 1881, 2014 WL 3882501, at *3 (N.D. Ill. Aug. 7, 2014).

We briefly address Harrison's § 1981 retaliation claim against Grunloh. As discussed above, Harrison has failed to establish a causal connection between his protected activity and his transfer, which took place six weeks later. In addition, Harrison has not introduced any evidence to suggest that Grunloh knew about Harrison's history of protected activity prior to making the March 22, 2010 phone call. Harrison points to evidence showing that Grunloh knew about the hate crime investigation. (Pl.'s Ex. 3 (5/20/10 emails between Harrison, Grunloh, and others).) But that evidence—as well as Grunloh's uncontroverted deposition testimony—demonstrates that Grunloh did not learn such information until *after* Harrison's transfer. (*See id.*; Grunloh Dep. at 14–19; Grunloh Decl. ¶¶ 5–14.) Accordingly, Grunloh cannot have acted with any retaliatory motive on March 22, 2010. *See Kidwell*, 679 F.3d at 966; *Porter*, 700 F.3d at 957–58; *Leitgen*, 630 F.3d at 958.

As to the racial discrimination claim against Grunloh, Harrison's claim can withstand summary judgment only if he raises a question of fact about Grunloh's knowledge of and participation in the reassignment decision. Under either § 1981 or § 1983, an individual defendant can be liable "only if the supervisor causes or participates in a constitutional deprivation." *Williams v. County of Cook*, 969 F. Supp. 2d 1068, 1082 (N.D. Ill. 2013); *see Hildebrandt v. Illinois Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). "Personal involvement exists where the misconduct 'occurs at [his] direction or with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.'" *Harris v. Illinois*, 09 C 3071, 2014 WL 2766737, at *16 (N.D. Ill. June 18, 2014) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1991)); *Hildebrandt*, 347 F.3d at 1039; *Williams*, 969 F. Supp. 2d at 1082. Harrison must also introduce evidence suggesting that Grunloh acted "either intentionally or with deliberate indifference" in an effort to "single[] out a

particular group for disparate treatment[.]" *Nabozny v. Podlesny*, 92 F.3d 446, 454 (7th Cir. 1996); *McPhaul v. Board of Comm'rs of Madison Cty.*, 226 F.3d 558, 564 (7th Cir. 2000).

Here, there is no evidence in the record to support Harrison's claim that Grunloh acted either recklessly or intentionally in an effort to discriminate against him. First, there is no evidence—discounting Harrison's rank speculation—that Grunloh knew Harrison's race at the time he made the March 22, 2010 phone call. To the contrary, Grunloh testified that he did not know at that time that Harrison is African-American. (Grunloh Dep. at 14–19; Grunloh Decl. ¶ 11.) This omission is fatal to Harrison's claim.

Second, the record does not permit any inference that Grunloh directed or condoned Harrison's transfer to the Yard. Grunloh was told to make the phone call and order Harrison to report to the Yard for work, but there is no evidence that he was involved in the decision to force the transfer itself. (Grunloh Dep. at 11–14.) Grunloh testified, for example, that "[t]he Secretary asked me to make a phone call to Mr. Harrison and tell him that we were going to temporarily reassign him for operational needs." (*Id.* at 12.) The record does not suggest that Grunloh was involved in the decision-making process that took place prior to his involvement. He was not told why the transfer was necessary, or what the Yard's operational needs might be. (*Id.* at 11–18; Grunloh Decl. ¶¶ 3–11.) No reasonable jury could conclude that Grunloh acted with the requisite level of intent under these facts.[20] *See McQueen v. City of Chi.*, 09 C 2048, 2014 WL 1715439, at *3 (N.D. Ill. Apr. 30, 2014) (holding that fielding an employee's inquiries was not sufficient to show personal involvement in a § 1983 action); *see also Crowder v. Lash*, 687 F.2d

---

[20] To the extent Harrison contends that Grunloh should have taken some corrective action once he learned of the alleged discrimination, we add that neither the evidence before us, nor precedent, supports such an argument. *See Burks v. Raemisch*, 555 F.3d 592, 593–94 (7th Cir. 2009); *Soderbeck v. Burnett Cty., Wis.*, 752 F.2d 285, 293 (7th Cir. 1985); *Odogba v. Wisconsin Dep't of Justice*, 13 C 573, 2014 WL 2109986, at *10 (E.D. Wis. May 19, 2014) ("The failure to take corrective action does not alone give rise to a claim under §§ 1981 and 1983.").

996, 1005–06 (7th Cir. 1982).  For these reasons, we grant the motion as to Counts III through V and dismiss Defendant Grunloh.

## II.    CLAIMS BASED ON HARRISON'S 2011 SUSPENSION

We turn next to evaluate Harrison's claims based on his suspension for the events of August 21, 2011.  In Count II against IDOT, Harrison alleges that his suspension was retaliatory in violation of Title VII.  In Counts VII and IX, brought under §§ 1981 and 1983, Harrison alleges that Travia and Fulgenzi, respectively, retaliated against him in their individual capacities.  Counts VI and VIII include racial discrimination claims against Travia and Fulgenzi, also under §§ 1981 and 1983.

### A.    Harrison's Retaliation Claims (Counts II, VII, and IX)

We begin with Harrison's retaliation claims.  Harrison does not specify whether he is using the direct or indirect method, but we shall address each in turn.

#### i.    Indirect Method

A plaintiff can successfully maintain a claim for retaliation under the indirect method by demonstrating that "after opposing the employer's discriminatory practice only he, and not any similarly situated employee who did not complain of discrimination, was subjected to a materially adverse action even though he was performing his job in a satisfactory manner." *Humphries*, 474 F.3d at 404; *see also Sylvester*, 453 F.3d at 902; *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  If an employee establishes a prima facie case of retaliation under this method, "the burden shifts back to the employer to produce a non-discriminatory reason for its action; if the employer meets this burden the burden shifts back to the employee to demonstrate that the proffered reason is pretextual." *Amrehein v. Health Care Serv. Corp.*, 546 F.3d 854, 859–60 (7th Cir. 2008); *Tomanovich v. City of Indianapolis*, 457 F.3d

656, 663 (7th Cir. 2006). The parties do not dispute that Harrison's suspension constitutes an adverse action. As for the protected activity, Harrison relies on the filing of this lawsuit on July 27, 2010. (Resp. at 14.) Although Defendants contend that Harrison's performance was not satisfactory, we need not address that element in light of our ruling. Indeed, Harrison's retaliation claims fail because he has not identified any similarly-situated employees who did not complain of discrimination and received better treatment under like circumstances.

In support of his claims, Harrison contends that Travia and Fulgenzi mangled their investigation and that Defendants flatly ignored evidence that no other Lead/Lead had ever been disciplined for conduct of similar seriousness. (Resp. at 13–14.) Setting aside Harrison's complaints about the investigation, which are immaterial, Harrison has not presented any evidence that other Lead/Leads engaged in conduct of a similar nature without being disciplined by IDOT, Travia, or Fulgenzi. (Resp. at 13; Pl.'s SOF ¶¶ 22–26.) Harrison's own testimony to that effect is vague and self-serving. (*See* Harrison Decl. ¶¶ 28, 31.) He states, for example, that although he has worked at ETP since 1995, "no white Lead/Lead had to go through a pre-disciplinary hearing for anything" and they "never got in trouble for anything." (Harrison Dep. at 87; Harrison Decl. ¶¶ 28, 31.) He declares that "IDOT has never disciplined, much less investigated, an ETP Lead/Lead . . . supervising ETP workers at an accident scene." (Harrison Decl. ¶ 31.) Yet he does not identify, by name or other detail, even one other Lead/Lead who handled an incident similarly yet was not subjected to discipline. Harrison cannot defeat summary judgment by relying on his own self-serving, unsupported comments. *See Keri v. Board of Tr. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006) ("Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment."); *Gabrielle M. v. Park Forest-Chicago Heights Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003)

(reiterating that "to withstand summary judgment, the non-movant must allege *specific* facts creating a genuine issue for trial and may not rely on vague, conclusory allegations").

In support of his assertion, Harrison provided copies of Incident Reports demonstrating that other lane closures occurred on various dates from 2007 through 2011. (Pl.'s SOF, Ex. 10.) While these reports show that similar types of lane closures occurred, they do not readily identify who was working or indicate whether those individuals had engaged in any prior protected activity. Nor do the reports state whether IDOT investigated the incidents or disciplined ETP employees for their handling of those lane closures. (*Id.*) For example, the report concerning the August 21, 2011 incident does not show that IDOT suspended Harrison and two other employees, though we know that the investigation and suspensions in fact occurred. (*See id.* at 14–15.) The reports themselves simply do not provide the type of specific comparator information that Harrison needs to make out his prima facie case. Harrison, moreover, did not identify any particular Lead/Leads working during these other lane closure incidents or describe how they might be appropriate comparators.[21]

Harrison argues that other Lead/Leads damaged IDOT equipment and caused fires on the roadway, yet were neither investigated, nor punished. (Pl.'s SOF ¶ 25; *see* Harrison Decl. ¶ 31; Harrison Dep. at 90–96.) Harrison identified five ETP employees, including three Lead/Leads and two lead workers, who allegedly damaged IDOT vehicles over the years and/or dragged semis off the highway, resulting in fires. (Harrison Decl. ¶ 31; Harrison Dep. at 90–96.) There

---

[21] In his deposition, Harrison named two lead workers—Brian Suchy and Sonny English—who worked on August 21, 2011 but were not punished. (Harrison Dep. at 80–82, 89.) Harrison pointed out that both Suchy and English failed to remove the trailer promptly but were not subject to investigation or discipline. (*Id.* at 80–82.) Suchy and English were not Lead/Leads on August 21, 2011. Lead workers are subordinate to Lead/Leads. (Defs.' SOF, Ex. L (8/7/13 Decl. of Michael Schivarelli) ¶¶ 5–7.) Although Harrison did not argue this point in his brief, we cannot conclude on the record before us that Suchy and English were similarly-situated to Harrison for either his race or retaliation claims.

are several reasons that this evidence is not sufficient to show that these individuals might be similarly-situated to Harrison.  First, Harrison's testimony on this point constitutes hearsay. (Harrison Dep. at 90–96, 99.)  As he acknowledged in his deposition, Harrison has no personal knowledge of these incidents.  (Harrison Dep. at 93–96.)  He testified that he did not witness these events but heard about them from other, unidentified ETP employees.  (*Id.* at 93–94.)  In addition, he was not personally involved in any investigation resulting from these incidents, as he was not responsible for disciplining either other Lead/Leads or lead workers not on his shift.  (*Id.* 94–96, 99.)  Accordingly, his testimony about the lack of discipline also amounts to hearsay. (*Id.*)  *See, e.g.*, *Gunville v. Walker*, 583 F.3d 979, 985–86 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment.").  Harrison cannot use this information to prove the truth of the matter asserted, namely that others committed these acts and were not disciplined.

Second, there is no evidence in the record about any prior protected activity, or lack thereof, by these five individuals.  No reasonable jury could conclude that Harrison was treated differently, *because of his protected activity*, without that point of comparison.  *Bilal*, 2006 WL 756066, at *3.  Third, the evidence also does not suggest that the incidents he describes are substantially similar to the incident on August 21, 2011.  The conduct he identifies does not strike us as comparable to Harrison's alleged failures of August 21, 2011.  Harrison, the Lead/Lead in charge of the August 21, 2011 situation, was charged with poor supervision of ETP personnel, unprofessional conduct, poor public image, and poor work performance.  (Fulgenzi Decl., Ex. 4.)  This conduct involved errors in supervisory judgment and allegedly exacerbated the situation, resulting in greater inconvenience to the public.  Yet Harrison has not articulated how the alleged behavior of the five other ETP employees (damaging an IDOT vehicle, or

improperly dragging a semi off the road) should be deemed comparable to his alleged conduct. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 309–10 (7th Cir. 2012) (explaining that proffered comparators must have, among other things, "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them"); *Hanners*, 674 F.3d at 692–93; *Tomanovich*, 457 F.3d at 666–67. Because Harrison has not raised a question of fact as to this necessary element of his prima facie case, he cannot proceed with these retaliation claims using the indirect method.[22]

### ii. Direct Method

As mentioned earlier, to succeed on a retaliation claim using the direct method, Harrison must show that he engaged in protected activity, that he suffered an adverse action, and that there is a causal connection between the two. *Argyropoulos*, 539 F.3d at 733; *Culver*, 416 F.3d at 545. Harrison's claim hinges on whether he has raised a triable question of fact that, but for the filing of the lawsuit, Defendants would not have suspended him. *Nassar*, — U.S. —, 133 S. Ct. at 2533.

To establish the causal connection, Harrison may rely on a "convincing mosaic of circumstantial evidence" that would permit an inference of retaliatory motive. *Coleman*, 667 F.3d at 860 (internal quotation omitted). As with his discrimination claims, such circumstantial evidence may include suspicious timing, preferential treatment of similarly-situated counterparts, or evidence of pretext. *Coleman*, 667 F.3d at 860; *Volovsek*, 344 F.3d at 689; *Darchak*, 580 F.3d at 632. As discussed above, Harrison has not substantiated his claim that similarly-situated employees were treated better.

---

[22] We decline to continue through the remaining steps of the *McDonnell Douglas* framework. To the extent that Harrison argues pretext, we address those same arguments when considering these claims under the direct method.

While he certainly contests the underlying reasons for his suspension,[23] Harrison relies on temporal proximity to demonstrate but for causation. He points out that he "was in the middle of a lawsuit against IDOT where he named Fulgenzi and Travia as individual defendants." (Resp. at 14.) This timing argument fails, however, because he filed the lawsuit more than a year before this incident took place. Such a long lapse in time is insufficient to warrant any inference of retaliatory motive. Moreover, Harrison does not cite any caselaw to support the implication that he should have been insulated from employer discipline during the pendency of his lawsuit (or other protected activity). Quite the contrary, employers are not obligated legally to delay or withhold discipline when they feel it is warranted, just to break up temporal proximity. *See, e.g.*, *Bermudez v. TRC Holdings, Inc.*, 1638 F.3d 1176, 1179 (7th Cir. 1998) ("A charge of discrimination does not require an employer to keep a position vacant indefinitely."); *Jones v. City of Elgin*, 96 C 6920, 1998 WL 259538, at *15–16 (N.D. Ill. May 13, 1998) ("The City of Elgin is entitled to take appropriate disciplinary action without giving rise to a retaliation claim."); *Clay v. Interstate Nat'l Corp.*, 900 F. Supp. 981, 993–94 (N.D. Ill. 1995) (holding that temporal proximity could not establish prime facie case where plaintiff filed a complaint shortly before his employer was scheduled to review his probationary status).

Beyond timing, Harrison has failed to come forward with any evidence that might permit a reasonable jury to find retaliation, or pretext. He points to no ambiguous comments or other circumstantial evidence that might connect the filing of his lawsuit with his suspension more

---

[23] As noted earlier, and in light of our ruling, we need not address the many disputed facts about the events of August 21, 2011 and IDOT's investigation.

than a year later.[24]  As a result, Harrison's retaliation claims based on his suspension—Counts II, VII, and IX—are dismissed.

### B.     Harrison's Race Claims, as against Travia and Fulgenzi (Counts VI, VIII)

Finally, we address Harrison's claims against Travia and Fulgenzi for race discrimination under § 1981 and § 1983.[25]  Harrison has not indicated whether he proceeds under the indirect or direct method, so again we shall address both briefly.

For the same reasons discussed in detail above, Harrison cannot withstand summary judgment using the indirect method on this claim.  Harrison plainly falls within a protected class and suffered an adverse employment action.  But Harrison has not identified any non-African-American similarly-situated ETP employees that were treated more favorably under comparable circumstances.  Neither Harrison's self-serving testimony, nor the Incident Reports, constitute specific, admissible evidence of appropriate comparators.  As noted earlier, for example, the Incident Reports do not provide detail about the alleged comparators, such as their races or whether Defendants investigated or disciplined them for their roles in the other lane closures.  Without addressing Harrison's disputed work performance, we conclude that he has failed to make out a prima facie case of discrimination under the indirect method.

As for the direct method, Harrison has not offered relevant direct or circumstantial evidence sufficient to allow an inference of racial discrimination on the part of Travia and Fulgenzi.  He has not introduced any evidence of ambiguous or questionable comments.  *See, e.g.*, *Coleman*, 667 F.3d at 860; *Volovsek*, 344 F.3d at 689; *Darchak*, 580 F.3d at 632.  As

---

[24] The affirmative action information offered by Harrison would not support his retaliation claim, as it does not concern the treatment of employees who have engaged in protected activity.  We address that evidence in our discussion of Harrison's § 1981 and § 1983 race claims, below.

[25] Harrison has not asserted a race discrimination claim against IDOT based on his 2011 suspension.

previously discussed, Harrison has not raised a question of fact either as to the timing of the suspension imposed by Travia and Fulgenzi or as to similarly-situated comparators.

In support of his claims, Harrison asserts that IDOT knew that it was suspending African-American employees at a far greater rate than white employees, yet Travia and Fulgenzi did nothing to remedy this situation. (Resp. at 13.) Harrison points to IDOT's Affirmative Action Plans ("Plans") for several recent years, which show that IDOT considered the suspension of African-American males, including highway maintainers, to be a problem area. (Pl.'s SOF, Ex. 19 at 5, 7, 21, 23, 35, 37, 50, 52, 59, 61.) The Plans list action items, such as monitoring lay-offs and developing plans for the Bureau of Civil Rights to be notified of all disciplinary actions against African-American male employees. (*Id.*) The Plans assign responsibility for those action items to Labor Relations and the Bureau Chief of Civil Rights. (*Id.*) Harrison also points to IDOT's EEO/AA Program Quarterly Review reports ("Reviews"), in which IDOT acknowledges that discipline is an ongoing issue. (*See, e.g.*, Pl.'s SOF, Ex. 20 at 34 (8/29/11 Review).) The Review dated August 29, 2011, for example, states that African-American employees make up 4% of the service maintenance staff but receive 25% of the suspensions imposed. (*Id.*)

Harrison argues that the Plans and Reviews show that Travia and Fulgenzi were obligated, but failed, to take action to ensure that discipline they imposed was not discriminatory. (Resp. at 13.) Neither these documents, nor the record on the whole, support Harrison's theory. The Plans and Reviews offer general affirmative action and statistical information, but they do not permit any inference of discriminatory motive on the part of Travia and Fulgenzi personally, as necessary for these claims. *See, e.g.*, *Hildebrandt*, 347 F.3d at 1039; *Gentry*, 65 F.3d at 561. Travia testified, for example, that he was not aware that IDOT appeared to be disciplining

African-American highway maintainers at a greater rate than their white counterparts.  (Defs.'
SOF, Ex. E, Travia Dep. at 22–23; *see also id.* at 60–61 ("I'm not aware that there's any
discriminatory practice going on.").  And while the Plans identify action items, it assigns
responsibility for those items to Labor Relations and the Bureau Chief of Civil Rights—not to
either Travia or Fulgenzi.  (*See* Pl.'s SOF, Ex. 19 at 5, 7, 21, 23, 35, 37, 50, 52, 59, 61.)
Furthermore, the Plans and Reviews do not impose or alter disciplinary procedures.  They do not
require Defendants to pursue, or refrain from, specific discipline in specific instances.  Because
the Plans did not require Travia or Fulgenzi to take any particular action, no reasonable jury
could infer, as Harrison suggests, that their alleged failure to execute those institutional goals
reveals a discriminatory motive.  In short, Harrison has not connected these materials to
Defendants' conduct with respect to his 2011 suspension.

Even if the Plans and Reviews related to Travia, Fulgenzi, their investigation, or their
decision to suspend Harrison, these materials are insufficient to warrant any inference of
discrimination.  *See Titus v. Ill. Dep't of Trans.*, 11 C 944, 2014 WL 625700, at *5 (N.D. Ill.
Feb. 18, 2014) (holding that plaintiff could not defeat summary judgment on his race
discrimination claim by relying solely on similar IDOT plans and statistics).  "Standing alone,
statistics cannot establish a case of individual disparate treatment."  *Banthia v. Roche
Diagnostics Ops., Inc.*, 205 F. App'x 571, 574 (7th Cir. 2012) (quoting *Plair v. E.J. Brach &
Sons*, 105 F.3d 343, 349 (7th Cir. 1997)); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 615
(7th Cir. 2000) (explaining that statistics can "show a relationship between an employer's
decisions and the affected employees' traits" but "they do not show causation").  A party cannot
withstand summary judgment by relying exclusively on statistics, without offering additional
evidence and without accounting for nondiscriminatory explanations.  *Rummery v. Illinois Bell*

*Tel. Co.*, 250 F.3d 553, 559 (7th Cir. 2001); *Bell v. Environmental Prot. Agency*, 232 F.3d 546, 552–53 (7th Cir. 2000) (stating that statistical evidence may be probative when paired "with other evidence of disparate treatment"); *see Mason v. Board of Tr. of Univ. of Ill.*, 830 F. Supp. 2d 532, 544 (C.D. Ill. 2011).  Here, Harrison has not provided other admissible evidence, beyond the Plans and Reviews, from which a jury might infer a discriminatory motive on the part of Travia and Fulgenzi.  Accordingly, we grant Defendants' motion as to Counts VI and VIII.

## CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is granted as to Counts II through IX.  We relatedly dismiss Defendants Grunloh, Travia, and Fulgenzi from this action.  Only Count I asserted against IDOT, alleging race discrimination in violation of Title VII, remains pending for trial.  It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: November 12, 2014
Chicago, Illinois